UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

UNITED STATES OF AMERICA,

                    Plaintiff,

      v.

HOWARD DENNIS KELLY,

                   Defendant.

———————————————————

<u>REPORT & RECOMMENDATION</u>

06-CR-6077L

## <u>BACKGROUND</u>

By Order dated May 17, 2006, all pre-trial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).[1]  (Docket # 3).

Defendant Howard Dennis Kelly ("Kelly") is charged in a single-count indictment.  Specifically, the Indictment charges that between the dates of October 17, 2005 and May 9, 2006, Kelly violated the conditions of his confinement by failing to remain in a Volunteers of America, Inc. Halfway House, an institutional facility to which he had been lawfully confined pursuant to a federal court judgment of conviction, in violation of 18 U.S.C. §§ 751(a) and 4082(a).  (Docket # 2).

---

[1]  This case was originally referred to this Court by the Hon. Michael A. Telesca, United States District Judge.  (Docket # 3).  Thereafter, on August 29, 2006, the matter was transferred to the Hon. David G. Larimer, United States District Judge.

Currently pending before this Court is Kelly's motion to suppress statements.[2] (Docket # 13).  In addition, Kelly has submitted two *pro se* motions seeking dismissal of the Indictment based upon a violation of the Speedy Trial Act.  (Docket ## 28, 31).  The following constitutes the report and recommendation of this Court with regard to each of the pending motions.

## FACTUAL BACKGROUND

On May 11, 2007, an evidentiary hearing was conducted concerning Kelly's suppression motion.  At the hearing, the government offered the testimony of Deputy Marshal Jeffrey White, a criminal investigator for the United States Marshals Service in the District of New Hampshire.  Based upon the credible testimony, the following is a summary of the relevant factual background.

Deputy Marshal White testified that one of his duties as a criminal investigator for the United States Marshals Service is to investigate fugitives.  (Tr. 3).[3]  Generally, when White locates a fugitive suspect, he will approach the individual, detain him and ask the individual who he is, all in an effort to confirm that individual's identity.  (Tr. 4).  In order to conduct an investigation, White is typically provided with the fugitive's biographical data, such as height, weight, hair and eye color, a description of any scars or tattoos and a photograph.  (Tr. 4).

---

[2]  Kelly's omnibus motion relating to the superseding indictment also sought, *inter alia*, *Brady* material, *Jencks* material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence and the preclusion of evidence not produced during discovery.  (Docket # 13).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on August 23, 2006.  (Docket ## 16, 18).

[3]  The transcript of the suppression hearing conducted before this Court on May 11, 2007, shall hereinafter be referenced as "Tr. __."  (Docket # 32).

With respect to this case, White testified that he was investigating an outstanding federal arrest warrant for Howard Dennis Kelly, which was issued following his failure to appear at a halfway house for a term of confinement.  (Tr. 10).  On May 9, 2006, White observed an individual he believed to be Kelly at a campground in Epsome, New Hampshire.  (Tr. 5).  White had been provided with a surveillance photograph taken a few days earlier of Kelly and another individual, Paula Belknap, who herself was the subject of a Pennsylvania state warrant and believed to be traveling with Kelly.  (Tr. 5).  He also had information concerning the type of camper Kelly was reportedly using.  (Tr. 5).  White arrived at the campground and initially observed a camper matching the description of the one Kelly was likely using.  After driving around the campground, White returned and observed a male matching the photograph of Kelly and a female standing outside the camper.  Kelly was holding pruning shears and appeared to be working on a plant.  (Tr. 6-7).

With the assistance of uniformed officers, White approached Kelly and the female with his firearm drawn and ordered them to put their hands up.  White further directed Kelly to drop the pruning shears and to turn around.  As White handcuffed Kelly, he asked him who he was.  Kelly did not initially answer the question, and White escorted him to his vehicle where he again asked him his name.  This time Kelly responded by indicating that his wallet was in the camper and that his name was on his identification.  (Tr. 7).  Epsome Police Chief Wayne Prevy thereafter retrieved Kelly's wallet and removed several forms of identification, including a driver's license and credit cards.  (Tr. 8).  Each of those items bore the name "Ross Milburn." (Tr. 8, 15-17).  White then asked Kelly "who the woman was," and Kelly replied, "that's my wife . . . Donna."  (Tr. 8).

Apart from the questions relating to Kelly's identity and the identity of the woman, White did not ask Kelly any other questions and did not seek to elicit information relating to the underlying charge as to which the warrant had issued.  White further testified that he never advised Kelly of his *Miranda* rights, nor did he threaten Kelly or make any promises to him in order to induce him to identify himself or the woman he was with.  (Tr. 9).  The purpose of the questions, White testified, was to confirm the identity of Kelly and Belknap.  (Tr. 10).

## DISCUSSION

Kelly moves to suppress the statements made by him in response to White's questions relating to his identity and the identity of his female companion.  (Docket # 13).  Kelly also moves for dismissal of the Indictment based upon an alleged violation of the Speedy Trial Act, 18 U.S.C. § 3161, *et seq*.  (Docket ## 28, 31).

## I.  Motion to Suppress Statements

In *Miranda v. Arizona,* 384 U.S. 436, 444 (1966), the United States Supreme Court held that the government may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege.  The record before this Court clearly demonstrates that Kelly was not advised of his *Miranda* rights before being questioned by White about his identity.  (Tr. 9).  The government argues that this omission is immaterial because Kelly was not subjected to custodial interrogation and that a reading of the *Miranda* warnings was thus not required.

4

As framed by the Second Circuit Court of Appeals,

[c]ustodial interrogation exists when a law enforcement official
questions an individual and that questioning was (1) conducted in
custodial settings that have inherently coercive pressures that tend
to undermine the individual's will to resist and to compel him to
speak (the in custody requirement) and (2) when the inquiry is
conducted by officers who are aware of the potentially
incriminating nature of the disclosures sought (the investigative
intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*,

834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).  Here, the government concedes that

Kelly was in custody at the time he was questioned by White.  (Tr. 18).  The only question

remaining is whether White's questions relating to Kelly's identity and the identity of the woman

amounted to interrogation.

"Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure

of compulsion above and beyond that inherent in custody itself."  *Rhode Island v. Innis*, 446 U.S.

291, 300 (1980).  Interrogation includes direct questioning, as well as "any words or actions on

the part of the police (other than those normally attendant to arrest and custody) that the police

should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode

Island v. Innis*, 446 U.S. at 301.  *See also United States v. Montana*, 958 F.2d 516, 518 (2d Cir.

1992).

A well-known exception to the *Miranda* requirement exists for questions relating

to general pedigree information.  Under this "pedigree exception," the "solicitation of

information concerning a person's identity and background does not amount to custodial

interrogation prohibited by *Miranda v. Arizona,* . . . whether the solicitation occurs before . . . or

after . . . *Miranda* warnings are given." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir.

1988) (citations omitted).   The pedigree exception includes "routine booking question[s]"

designed to elicit "biographical data necessary to complete booking or pretrial services."

*Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990).   The pedigree exception does not include

questions designed to elicit incriminating admissions.   *Id.* at 602 n.14; *see also Innis*, 446 U.S. at

301.   As the Second Circuit has acknowledged, "[r]outine questions about a suspect's identity . . .

[are] ordinarily innocent of any investigative purpose [and] do not pose the dangers *Miranda* was

designed to check; they are rather the sort of questions 'normally attendant to arrest and

custody.'" *United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986) (quoting *Innis*, 446 U.S. 291,

301 (1980)).

   In the case at bar, Deputy Marshal White observed a person he believed to be

Kelly based upon surveillance photographs and other biographical information provided to him.

With the help of other officers, White approached Kelly with his firearm drawn and ordered him

to put his hands up.   As he handcuffed him and took him into custody, White asked Kelly who he

was.   (Tr. 5-7).   Kelly initially refused to answer and White escorted him to his car and asked a

second time for Kelly to identify himself.   Kelly responded by indicating that his identification

was in his camper.   Upon retrieving Kelly's wallet, White discovered that Kelly's identification

bore the name "Ross Milburn," which White knew to be incorrect.   (Tr. 8, 15-17).   At that point,

White asked Kelly who the woman was.   Kelly responded, "That's my wife . . . Donna," which

White also knew to be incorrect.   (Tr. 8).

   Considering first White's requests that Kelly identify himself, I find that such

requests fall within the pedigree exception, thus obviating the *Miranda* requirement.   White

testified that he asked Kelly who he was in order to confirm what he already believed – that the individual before him was Howard Dennis Kelly, a person for whom a federal arrest warrant had been issued.  (Tr. 10).  When Kelly produced identification in another name, White did not question him further about the suspected fraudulent identification.  Nor did White question Kelly about the underlying charge for his arrest.  Finally, no threats or promises were made to Kelly in order to induce him to identify himself.  Accordingly, I conclude that the simple identification questions asked by Kelly were not those that an officer would reasonably expect to elicit an incriminating response.  *See United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) ("Police often know the names of suspects they intend to apprehend . . . [,] [but as] a cautionary measure, police usually prudently inquire as to the suspect's name to ensure that the wrong person is not apprehended"); *United States v. Adegbite*, 846 F.2d at 838 (pedigree exception allows solicitation of a defendant's nickname, which was used on arrest warrant, for identification purposes); *United States v. Kadem*, 317 F. Supp. 2d 239, 241 (W.D.N.Y. 2004) (pedigree exception permits request that defendant identify himself in order to ensure correct person is apprehended).

It is less clear, however, whether White's subsequent request that Kelly identify his female companion also falls within the pedigree exception.  Although White could have asked Belknap to identify herself, instead he asked Kelly.  This question obviously was not designed to identify Kelly, and a question therefore arises whether Kelly's statement, "That's my wife . . . Donna," should be admissible in a prosecution against him.  The government has not provided, nor has this Court discovered authority analyzing the application of the pedigree exception to statements identifying a third party.  That acknowledged, I nonetheless recommend

7

denial of Kelly's motion to suppress his statement falsely identifying Belknap because it was not the product of custodial interrogation.  As stated above, interrogation refers to questioning by the police that is reasonably likely to elicit an incriminating response.  *See Innis*, 446 U.S. at 301.  I do no find that White's request that Kelly identify his female companion was reasonably likely to elicit a *self*-incriminating response by Kelly.

Although Kelly's untruthful responses to White's questions did in fact prove incriminating, that fact does not alter the analysis.  It was reasonable for White to assume that Kelly would respond truthfully to his questions.  In other words, he could not reasonably have expected Kelly to incriminate himself by lying about his identity; nor could he have reasonably expected Kelly to lie about his companion's identity.  *See United States v. Carmona*, 873 F.2d at 573 ("If the suspect chooses to give an alias, it may work to his prejudice"); *United States v. Tavares*, 2002 WL 31571662, *6 (S.D.N.Y. Nov. 18, 2002) ("Simply because a defendant gives false information in response to pedigree questions, and therefore renders the information incriminating, does not mean that *Miranda* warnings were required").

Accordingly, because I find that White's request that Kelly identify himself falls within the pedigree exception and that his request that Kelly identify Belknap did not constitute interrogation, it is my recommendation that Kelly's motion to suppress such statements be denied.

## II.  **Motion to Dismiss**

Also before this Court are two separate *pro se* motions submitted by Kelly

requesting dismissal of the Indictment based upon alleged violations of his right to a speedy trial.

(Docket ## 28, 31).

The Speedy Trial Act provides:

In any case in which a plea of not guilty is entered, the trial of a
defendant charged in an information or indictment with the
commission of an offense shall commence within seventy days
from the filing date (and making public) of the information or
indictment, or from the date the defendant has appeared before a
judicial officer of the court in which such charge is pending,
whichever date last occurs.

18 U.S.C. § 3161(c)(1).  The Act also provides for the exclusion of certain periods from the

calculation of the seventy-day limit.  18 U.S.C. § 3161(h)(1)-(8); *Zedner v. United States*, 126

S. Ct. 1976, 1983 (2006); *United States v. Pena*, 793 F.2d 486, 488 (2d Cir. 1986).

One of the authorized exclusions, commonly known as an "interests of justice"

exclusion, provides for an exclusion for "[a]ny period of delay resulting from a continuance . . . if

the judge granted such continuance on the basis of his findings that the ends of justice served by

taking such action outweigh the best interests of the public and the defendant in a speedy trial."

18 U.S.C. § 3161(h)(8).  Also, Section 3161(h)(1)(F) excludes periods of "delay resulting from

any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or

other prompt disposition of, such motion."  18 U.S.C. § 3161(h)(1)(F).  Once a motion is under

advisement by the Court, the Act affords an excludable period of up to thirty days for the court to

decide the motion.  18 U.S.C. § 3161(h)(1)(J).

I have carefully reviewed the record in this matter and find that Kelly's motion lacks merit.  Although there have been various periods of delay since the filing of the indictment, the majority of those periods have been attributable to Kelly's desire to engage in plea negotiations and his filing of various pretrial motions.[4]  I further find that any remaining periods excluded under the Speedy Trial Act have been properly excluded.  In short, I conclude that neither the Speedy Trial Act nor the Sixth Amendment has been violated by any delay in this prosecution.

## CONCLUSION

For the foregoing reasons, it is my recommendation that Kelly's motion to suppress statements **(Docket # 13)** be **DENIED**.  It is my further recommendation that Kelly's motions to dismiss the Indictment based upon a violation of the Speedy Trial Act **(Docket ## 28, 31)** be **DENIED**.

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       July   2  , 2007

---

[4]  From October 16, 2006 until February 23, 2007, Kelly was incarcerated in the District of Maine, having been transported there on a writ of habeas corpus *ad prosequendum* to face federal charges against him pending in that district.  *See* 18 U.S.C. § 3161(h)(1)(D).  *See United States v. Cabrera Sarmiento*, 659 F. Supp. 169, 172 (S.D.N.Y. 1987).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**</u>

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                   *s/Marian W. Payson*
                                        MARIAN W. PAYSON
                                   United States Magistrate Judge

Dated: Rochester, New York
        July   2  , 2007

---

    [5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).